**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CARLOS RODRIGUEZ,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | **No. 13-7632** |
| **v.** | : | |
| | : | |
| **P/O MICHAEL PANARELLO, P/O** | : | |
| **BRIAN MCDEVITT AND THE CITY** | : | |
| **OF PHILADELPHIA,** | : | |
| **Defendants.** | : | |

**MCHUGH, J.**                                                                                          **AUGUST 7, 2015**

**MEMORANDUM**

### I.        Introduction

This is a tragic case in which a New Year's indulgence involving marijuana laced with PCP led Plaintiff Carlos Rodriguez to engage in a streak of vandalism to automobiles in a residential neighborhood of Philadelphia.  He ultimately faced off with police as he jumped on the roof of a car.  Plaintiff refused to comply with officers' commands, and against a backdrop of uncertainty as to whether he was armed, an officer crept behind him and discharged a Taser, causing Plaintiff to fall to the ground.  That fall, in turn, led to a spinal injury and paraplegia.  Although Mr. Rodriguez' plight is compelling, given the admitted facts of the case, I cannot conclude that the officers' conduct amounts to a deprivation of civil rights.  Accordingly, I am obligated to grant Defendants' Motion for Summary Judgment.

### II.        Facts

a.   The Incident of January 1, 2012

The essential facts in this case are not in dispute.  Before midnight on January 1, 2012, police received a series of calls about a male vandalizing cars on the 6600 block of Large Street in Philadelphia.  The Court will take judicial notice that the immediate area where this incident occurred is residential, densely populated with row homes.  Three calls reported a male vandalizing vehicles.  A fourth call reported that he was breaking mirrors off cars and throwing them at houses.  A fifth caller reported that a man was breaking into a car, that three gunshots had been fired, and people were screaming.  At that point, the two individual Defendants in this case, Officer Michael Panarello and Officer Brian McDevitt, were dispatched to the scene.  After their dispatch, police radio received another call reporting a person with a gun at that same location who was jumping on vehicles. These calls are documented in a City of Philadelphia Computer Automated Dispatch Report.  Defendants' Motion at Ex. A.

According to deposition testimony from the individual Defendants, the information provided by these radio calls was the only information they had upon arrival at the scene.  Dep. Panarello, 25: 9–26; Dep. McDevitt, 12:10–13.  When police arrived, they found Plaintiff jumping on the roof of a car.  Several officers testified that Plaintiff was shouting obscenities and making "quick movements" and acting "aggressive."  Dep. Panarello 30:24, 33:10–11.  According to their depositions, the officers ordered Plaintiff to show his hands, but he kept his hands in his pockets.  Dep. Panarello 20:7–8; Dep. McDevitt 15:16–21; Dep. Bennett 14:2–3.  Another officer described movement toward his waist area and pockets.  Def. Quinn, 18:12–24.  A crowd of civilians was present.  Dep. Panarello 27:10–14; 80:12–21.

Based on his experience as a police officer, Defendant Panarello believed that Plaintiff was under the influence of PCP.  Dep. Panarello 33:21–23.  His intuition was correct, because Mr. Rodriguez tested positive for phencyclidine when he was admitted to the hospital that night.

At deposition, Plaintiff also acknowledged smoking marijuana and having consumed two beers before the incident.  Dep. Carlos Rodriguez 46:24–47:7.  Further based on his experience, Officer Panarello was concerned about the tendency of individuals high on PCP to be aggressive and violent,[1] and he interpreted Mr. Rodriguez's behavior as an indication that the drug was having such an effect.  Dep. Panarello, 33:21–23.  Three officers were sufficiently concerned to have drawn their service weapons.  Dep. Bennett 13:2–11; Dep. McDevitt 18:23.  Officer Panarello had a concern for the civilians present and worried that any attempts to move them would still expose them to jeopardy from a possibly armed suspect.  Dep. Panarello 27:10–14; 80:12–21.  Officer Panarello also testified to a concern, based on experience, that a suspect can discharge a weapon through clothing.  *Id.* at 28:5–14.

Officer Panarello moved behind Plaintiff and fired a Taser at him.  Officer Panarello concedes he did not warn Plaintiff about the Taser, explaining at deposition that he feared for his safety and did not want to give away his position before deploying the Taser.  Dep. Panarello 19:18–20:2.  The Taser's prongs struck Plaintiff, and Plaintiff fell off the roof of the car on which he was standing.  Officers handcuffed Plaintiff after he fell.  Several police witnesses testified he was still resisting after the fall.  Dep. McDevitt 23–24; Dep. Bennett at 27; Dep. Quinn 9–16; 28–29.  According to the report of the Philadelphia Fire EMS, vital signs could not be taken because the patient was combative.  Exhibit H, page 1 at 22:31.

---

[1] That insight was also well-founded, because PCP is a dissociative drug, not an opioid, and capable of causing hallucinations.  Characteristics of dissociative drugs include the feeling of being disconnected from one's self and the feeling that the outside world is unreal or that one is dreaming.  According to the National Institute on Drug Abuse, PCP can cause aggressive and violent behavior.  Fact Sheet: Hallucinogens and Dissociative Drugs, National Institute of Health – Institute on Drug Abuse.  For that reason, the National Drug Intelligence Center, part of the United States Department of Justice, has warned of the risk that "users often become violent."  PCP Fast Facts, National Drug Intelligence Center (2003).

The City of Philadelphia has a Directive concerning Use of Force, Directive 22, that addresses the use of Electronic Control Weapons (ECW) such as Tasers.  That directive, in Appendix A, is intended to provide "guidance and direction" on the use of Tasers. In paragraph 10, it provides: "The ECW **SHALL NOT** be used… [a]gainst a subject when in an elevated position where a fall may cause substantial injury or death."  Significantly, however, the guidelines for use of a Taser are to be applied "in the context of the Use of Force Continuum."  Directive 22-1.  The Use of Force Continuum itself then further provides: "The level of response is based upon the situation encountered at the scene and the actions of the subject in response to the officer's commands.  Such response may progress from the officer's physical presence at the scene to the application of deadly force."  Directive 22-3.  To his credit, Officer Panarello candidly acknowledged that he violated the literal terms of Directive 22 by discharging his Taser at a suspect who was elevated, qualifying that violation as his effort to use less than deadly force.  *Id.* at 44, 64.  Both Officer Panarello and Officer McDevitt had been trained in the proper use of Tasers and were certified to use them by the Philadelphia Police Department.

   b.  Plaintiff's Complaint

Plaintiff alleges violations of his Fourth, Fifth, Eighth, and Fourteenth Amendment rights by the individual officers involved in the incident and by the City of Philadelphia.

Count I  alleges a violation of Plaintiffs' civil rights pursuant to 42 U.S.C. § 1983, contending that Officer Michael Panarello, Officer Brian McDevitt, and other unidentified officers violated Plaintiff's Fifth, Eighth, and Fourteenth Amendment rights to due process, freedom from excessive use of force, and freedom from cruel and unusual punishment.

Count II alleges that the City of Philadelphia was deliberately indifferent to the need to implement policies, customs, and practices about the appropriate use of force, supplemented by Count III alleging that the City "has adopted policies, procedures, practices or customs … that allow the use of excessive force."  Complaint ¶ 33.

Count IV alleges that police officers violated Plaintiff's Fourth, Fifth, Eighth, and Fourteenth Amendment rights by placing him in handcuffs even though he was paralyzed.

Finally, Count V alleges a state law tort of assault and battery against the police officers.

c.  Procedural Posture of the Case

Oral argument on the motion was held on March 19, 2015.  During that proceeding, counsel for Plaintiff argued that there were issues of fact with respect to the narrative provided by various police witnesses during depositions, making specific reference to "witness statements," and to a history in Plaintiff's hospital chart that purportedly contradicted Defendants' position.  The documents referenced by counsel had not been submitted to the court in opposition to the motion, and over Defendants' objection, Plaintiff was given leave to supplement the record by providing the court with those materials.  Thereafter, counsel for Plaintiff requested that the court defer ruling on the motion and that Plaintiff be given leave to submit to his expert a newly generated report from the United States Department of Justice with respect to the use of deadly force by police officers in the city of Philadelphia.  Over Defendants' even more vociferous objection, the Court granted such leave to Plaintiff, and Plaintiff has submitted a supplemental report in analyzing the issues presented by this case.

**III.      Standard of Review**

This Motion is governed by the well-established standard of Fed. R.Civ. P. Rule 56, as interpreted by the Supreme Court in *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts

identified by the moving party and may not rest on mere denials.  *Id.* at 321 n.3; *First National Bank of Pennsylvania v. Lincoln National Life Insurance Co.*, 824 F.2d 277, 282 (3d Cir. 1987).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the suit under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Defendants here may make a prima facie showing they are entitled to summary judgment "by producing evidence that negates the non-movant's claims" and by "pointing to an absence of evidence to support an essential element of the nonmoving party's claim."  *Celotex Corp.*, 477 U.S. at 325.  At that point, the Plaintiff has the burden to convince the Court to the contrary. Fed. R. Civ. P. 56(c).

## IV.    Discussion

Defendants' motion seeks summary judgment on all of Plaintiff's claims.  They assert that there is insufficient evidence to support Plaintiff's alleged violations of the Fifth, Eighth, and Fourteenth Amendments.  Plaintiff has not countered the defense's arguments, and his counsel agreed during oral argument that the crux of this case is the Fourth Amendment. Transcript of hearing, March 19, 2015 at 2.

Accordingly, there is no need for further discussion,[2] and summary judgment will be entered on Plaintiff's Fifth, Eighth, and Fourteenth Amendment claims.

---

[2] Defendants are correct that Fifth Amendment due process claims will not lie against non-federal officials.  *Nguyen v. U.S. Catholic Conference*, 719 F.2d 52, 54 (3d Cir. 1983); *Myers v. County of Somerset*, 515 F.Supp. 2d 492, 504 (D.N.J. 2007).  Defendants are also correct that the Eighth Amendment's prohibition of cruel and unusual punishment only applies "**after** the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."  *Ingraham v. Wright*, 430 U.S. 651, 664 n.40 (1977) (emphasis added).  Finally, with respect to the Fourteenth Amendment claim alleging a due process violation, as the Third Circuit explained in *Halsey v. Pfeifer*, the Fourth Amendment applies when an individual is arrested to protect against unreasonable seizures, and "at some point after arrest … constitutional analysis shifts to the Due Process Clause."  750 F.3d 273, 290 (3d Cir. 2014).  Here, where Plaintiff is alleging misconduct *during* his arrest, I am satisfied that Plaintiff's claims fall on the Fourth Amendment side of this admittedly imprecise line.

a.   Fourth Amendment Liability of Individual Officers

Plaintiff's remaining claims against the individual officers are based on the Fourth Amendment's prohibition against the excessive use of force by government officials.  Rodriguez alleges that the individual Defendants employed unconstitutionally excessive force (1) when Officer Panarello used a Taser on Plaintiff, and (2) when the officers arrested Plaintiff after he fell.  Defendants respond that Officer Panarello is shielded by qualified immunity for using a Taser on Plaintiff and contend that the officers did not use excessive force when arresting Plaintiff.

In the context of claims for excessive use of force, there is a certain logical awkwardness in analyzing a case under the doctrine of qualified immunity.  That is because both depend on the "reasonableness" of the involved officer and his conduct.  The standards for assessing reasonableness for the purposes of qualified immunity and excessive force are, in theory, objective.  That is, the officer's reasonableness is judged without regard to her "underlying intent or motivation."  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  By definition, an *objective* legal standard assumes the ability of an actor to assess a situation and act appropriately based upon what a proto-typically "reasonable" person would do under similar circumstances.  Logically, the force applied was either objectively reasonable or it was not.  But qualified immunity allows for a seeming anomaly: it permits an officer to escape liability for using unreasonable force if it can be said that he acted "reasonably" in doing so.  In *Anderson v. Creighton*, the Supreme Court specifically held that when applying qualified immunity in a Fourth Amendment context, it is valid "to say that one 'reasonably' acted unreasonably." 483 U.S. 635, 643 (1987) (Justice Stevens' dissent in *Anderson* persuasively argued that this creates a "double standard of reasonableness."  *Id.* at 648.).

7

I turn first to the question of whether the use of force in this case was reasonable. Reasonableness of force under *Graham* is analyzed by taking into account "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* These factors are not exclusive; the reasonableness of force depends on the "totality of the circumstances." *Id.* The Supreme Court emphasized in *Graham* that the legal test must be applied from a real-world perspective, "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," further observing that the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." 490 U.S. at 397.

Viewed against that standard, I am persuaded that no reasonable jury could find that the individual officers here violated the standard established by *Graham*. Plaintiff is prepared to present the testimony of a well-respected criminologist, Dr. Paul McCauley, to the effect that the officers could have approached the overall situation in a different manner. Dr. McCauley opines that if the officers had treated the situation more like a "barricade" scenario and taken up positions of cover away from the suspect, the situation might have been de-escalated. Preliminarily, I note that the Constitution does not, as a general rule, speak to the specific tactics of police officers when they first arrive upon a scene. The initial criticisms that Dr. McCauley has of the police might be relevant if the claim were one for negligence, but I am not persuaded under the facts here that any predicate acts of the police are actionable under the Fourth Amendment. It was not the conduct of the police that set events into motion—they were responding to a developing situation.

Beyond that, however, I do not believe that the critique is realistic given the situation that the officers faced. As set forth above, there was a series of calls which escalated in seriousness from "an act of vandalism" to "gunshots fired." The location of this incident is hardly remote; rather, it took place on a densely populated street of row homes. Citizens responding to the disturbance were on scene, and Mr. Rodriguez, if in fact he had been armed, was well within range of discharging a weapon at or into homes on both sides of the street. Putting to one side the fact that the officers had a crowd to disperse, even assuming that they could have found positions of cover, in doing so, they could not have assured the safety of the public.

Officer Panarello's intuition that Mr. Rodriguez was high on PCP, with all of the potential risks that that entails, was accurate. Three other officers on the scene felt sufficiently threatened that they had their service weapons drawn.

Plaintiff has not identified a genuine issue of fact. Specifically, no witness has been identified who would contradict any of the important points raised by Defendants' recitation of the facts.[3] I have reviewed the additional "statements" of witnesses, but they consist entirely of summary reports about the property damage inflicted to vehicles on the block. Counsel points to an entry in Plaintiff's medical chart that "police stated earlier that the patient was tasered because he was jumping on cars." Nazareth Hospital Emergency Room Summary Report at 4. In view of the substantial and detailed evidence otherwise in the record, I do not believe that this shorthand description by officers to medical personnel is a meaningful contradiction.

Plaintiff stresses that Officer Panarello violated one of the specific provisions of Directive 22. As noted above, however, the specific prohibitions on discharge of a Taser must

---

[3] I recognize the admonition of the Court of Appeals that in an excessive force case where the plaintiff cannot testify, a district court should be alert for self-serving testimony by officers accused on misconduct. *Lamont v. New Jersey*, 637 F.3d 177, 181–82 (3d Cir. 2011). In this case, however, it appears there were civilian witnesses present; the EMS record corroborates Plaintiff's continued combativeness, and the toxicology corroborates the presence of PCP.

be read in the context of the overarching policy embodied by the continuum on the use of force. Furthermore, a violation of a police policy does not in itself suffice to establish a constitutional violation. *See Smith v. Freland*, 954 F.2d 343, 347–48 (6th Cir. 1992) ("A city can certainly choose to hold its officers to a higher standard than that required by the Constitution without being subjected to increased liability under § 1983. To hold that cities with strict policies commit more constitutional violations than those with lax policies would be an unwarranted extension of the law, as well as a violation of common sense.").

Plaintiff also emphasizes that the Taser was discharged without warning. Taken in context, however, there is undisputed evidence that Mr. Rodriguez had not complied with police commands even though their weapons were drawn, and it is not the Court's place to second-guess the officer's fear for his own safety if he revealed his position before firing. Plaintiff further emphasizes the minor nature of the underlying incident—vandalism to vehicles. Once again, this ignores the evolving situation. Mr. Rodriguez coupled his vandalism with throwing car mirrors at the adjacent houses and then engaging in aggressive behavior. Officer Panarello considered trying to restrain Plaintiff physically, but discarded that option because of the threat that would have existed if Plaintiff was in fact hiding a gun. In simple terms, all of the choices facing the officers were fraught with some degree of peril, and although the force employed had a tragic outcome, when viewed objectively against the circumstances of that night I conclude that it was reasonable.[4]

---

[4] In a prescient article written early in her career, Fourth Amendment scholar Kathryn Urbonya, recently retired from the Law faculty at the College of William and Mary, advanced a compelling argument that resolving excessive force claims using a qualified immunity standard is needlessly complex and confusing. Kathryn Urbonya, *Problematic Standards of Reasonableness: Qualified Immunity in Section 1983 Actions for Police Officer's Use of Excessive Force*, 62 TEMP. L. REV. 61, 115–16 (1989). "In applying the current standard for qualified immunity to excessive force claims alleging a violation of the Fourth Amendment, courts should recognize that qualified immunity is an unnecessary defense because the standard for qualified immunity is identical to the Fourth Amendment standard for liability. … [W]hen the fact finder determines the issue of liability under the Fourth

Even if one assumes that Officer Panarello violated Plaintiff's Constitutional rights, Plaintiff's claim against Officer Panarello for using the Taser would still be barred.  Qualified immunity shields government officials from suit when their conduct does not violate clearly established constitutional law.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010).  The Supreme Court in *Saucier* instructed courts to analyze claims of qualified immunity in a two-part analysis, addressing first the question of whether a constitutional right was violated, and second whether that right was clearly established.  *Id.*  In *Pearson v. Callahan*, the Supreme Court gave lower courts discretion over the order in which to apply the steps of the *Saucier* analysis.  555 U.S. 223, 236 (2009).  Since *Pearson v. Callahan*, qualified immunity will protect an official *either* when the official did not violate a constitutional right *or* when the right in question was not "clearly established."  *Id.*

Several courts, including the Third Circuit in non-precedential decisions, have rejected excessive force claims arising from the use of a Taser when a suspect is in some way resisting police.  *Patrick v. Moorman*, 536 F. App'x 255, 259 (3d Cir. 2013); *Brown v. Cwynar*, 484 F. App'x 676, 680 (3d Cir. 2012) (holding that the use of a Taser on a struggling suspect after warning the suspect was not an excessive use of force).  Plaintiff contends that the particular facts of the case render the officers' conduct unreasonable, but the cases on which he relies to support that proposition are distinguishable.

In *Snauer v. City of Springfield*, No. 09-cv-6277-TC, 2010 WL 4875784 at *2, *5 (D. Or. Oct. 1, 2010), firing a Taser into a suspect at the top of a fence was held to be an improper use of force, but the suspect there was fleeing a routine traffic stop, and not posing a direct threat to officers or members of the public.  In *Cavanaugh v. Woods Cross City*, use of a stun gun without

---

Amendment, it automatically determines the issue of qualified immunity."  *Id.*  In *Anderson,* the Supreme Court appears to have rejected such an approach.

a warning to the suspect was considered to be an important factor in an unreasonable use of force analysis, but that case involved a domestic dispute, where the defendant officer "tased" a woman in the back as she was walking toward her home.  625 F.3d 661, 665 (10th Cir. 2010.).  The court concluded that in the absence of an imminent threat, or evidence that the suspect was fleeing or resisting arrest, such a use of force was patently unreasonable.  *Id.* at 666.  Here, Mr. Rodriguez refused to comply with police commands and was judged to be a threat to both the public and to the responding officers.

Finally, Plaintiff maintains that he was not posing an immediate threat to officers or resisting arrest while simply jumping up and down.  However, cases where courts have discounted the existence of a threat are different.  For example, in *Bryan v. MacPherson*, 630 F.3d 805, 832 (9th Cir. 2010), the court held that "Tasing" an unruly motorist stopped for a seatbelt offense was objectively unreasonable when he was at least 15 feet away from the police, and obviously unarmed in that he was dressed only in boxer shorts and sneakers.

The most compelling aspect of this case is the height at which Plaintiff was standing when the Taser was discharged.  The record does not reveal the precise height of the roof of the vehicle on which Mr. Rodriguez was standing at the time, but for purposes of analogy it is enough to note that the prevailing standard for fall protection in general industry workplaces is four feet.[5]  Despite that, the circuit court decision most analogous to this case is of no help to the plaintiff.  In *Harper v. Davis*, an alcohol-fueled disturbance at a barbecue prompted an inebriated suspect to fire a rifle inside a home.  571 Fed.Appx. 906 (11th Cir. 2014).  He then hid in the woods with the weapon, perching on a tree branch eight feet above the ground.  *Id.* at 909. When found by officers, he was told both to descend the tree and show his hands.  *Id.*  The

---

[5] United States Department of Labor, Occupational Safety and Health Administration (OSHA), Safety and Health Topics, "Fall Protection" (2015).

suspect protested he could not do both, but identified for the officers the location of the gun down by his feet.  *Id.*  Upon seeing the gun, even though the plaintiff was not holding it and had volunteered its location, an officer Tasered him, and the resulting fall caused paraplegia.  *Id.*  The Court concluded that the officer's perception of risk was reasonable and warranted the precautionary use of force.  *Id.* at 914.  In this case, the officers did not see a gun, but responded to radio calls that included a report of shots fired, and a man with a gun.  Unlike the suspect in *Harper,* Plaintiff here resisted the officers' instructions, and most importantly he refused to show his hands.  The law is clear that an officer need not be accurate in his perception of a risk in order to justify deadly force, but only that his perception of the threat and the corresponding need to use force is objectively reasonable under the conditions he faced.

Moreover, to defeat a qualified immunity defense, the right allegedly violated must have been clearly established at the time of the violation.  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' "  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011).  That was not the case here.  As of 2012, several courts had found the use of a Taser to bring a resisting subject under control was reasonable.  *See Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) ("Reynolds's use of the taser gun to effectuate the arrest of Draper was reasonably proportionate to the difficult, tense, and uncertain situation that Reynolds faced in this traffic stop.");  *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993); *see also Brown*, 484 F. App'x at 681 (collecting cases).  To find a right clearly established, "[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft*, 131 S. Ct. at 2083.  The parameters of the constitutional use of a Taser in

circumstances like those Officer Panarello confronted would not have been sufficiently clear that a reasonable officer would have known his conduct was unlawful.[6]  Officer Panarello is thus protected by qualified immunity for his conduct using a Taser on Plaintiff.

Plaintiff has also failed to show that the officers who arrested him used excessive force when handcuffing him after he fell.  As discussed above, whether police officers have used excessive force to arrest a person depends on the totality of the circumstances.  *Graham*, 490 U.S. at 396.  Here, Plaintiff has not shown evidence that the police officers were aware of the seriousness of his condition or knew that handcuffing the injured Plaintiff would cause pain or further injuries.  *Compare Gilles v. Davis*, 427 F.3d 197, 207–08 (3d Cir. 2005) (finding handcuffing plaintiff was not excessive because there was no evidence that plaintiff had alerted officers to pain of too-tight handcuffs) *with Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (officer's refusal to loosen handcuffs was unreasonable in the circumstances).  The un-contradicted evidence of record is that Mr. Rodriguez continued to struggle and resist in the immediate aftermath of his fall.

Because Officer Panarello is shielded by qualified immunity for his conduct using a Taser on Plaintiff, and Plaintiff has not produced evidence to support his claim that officers used excessive force when arresting him, summary judgment will be granted on Plaintiff's claims against all individual officers.

---

[6] I reiterate my concern about the intellectual weakness of a qualified immunity approach to excessive force cases Putting aside Justice Stevens' lament about creating a "double standard of reasonableness," the very nature of the inquiry is so fact specific that expecting decisional case law to "clearly establish" parameters in a meaningful and comprehensive way is unrealistic.  For example, despite the height at which the Plaintiff was standing, I have deemed the use of force necessary and reasonable.  If, in contrast, Plaintiff's conduct were non-threatening and he was using the car as a soapbox to denounce his neighbors, I would be hard pressed to immunize an officer who employed a Taser at that height, even if the Plaintiff resisted commands to come down.  As Justice Scalia opined in his article, *The Rule of Law as a Law of Rules*, these kinds of highly factual determinations do not fit particularly well within the traditional framework of our legal system in which judges decide questions of law and juries, after hearing and seeing evidence, decide nuanced questions of fact.  Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. CHI. L. REV. 1175 (1989).  But qualified immunity demands this artificial approach, and in the process, invites courts to equivocate.

b.   *Monell* Liability of Defendant City of Philadelphia

Plaintiff claims that the City of Philadelphia violated Plaintiff's constitutional rights when it failed to provide training to its officers that would have prevented the allegedly unconstitutionally excessive force.  Because I found there was no deprivation of Plaintiff's constitutional rights, there can be no municipal liability.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).  Nonetheless, I will assume for the sake of argument that there was an unconstitutional use of force on January 1, 2012.

Municipalities cannot be liable for the unconstitutional actions of their employees, but only for their own unconstitutional policies or customs.  *Monell v. Dept. of Social Servs.*, 436 U.S. 658 (1978).  In general, municipalities are not liable for a failure to train their police officers except "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).  To amount to "deliberate indifference," the need for training must be "obvious," and the lack of training "so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Id.*

As a result, to show a municipality exhibited deliberate indifference to the need for training to prevent a certain problem, a plaintiff will usually need to demonstrate a pattern of violations that would have made the need for training obvious to the municipality.  *Connick v. Thompson*, 131 S. Ct. 1350, 1361 (2011).  When a plaintiff can show no pattern of constitutional violations, there is only "a narrow range of circumstances" in which the need for training will be so obvious that deliberate indifference can be imputed to a municipality that fails to provide that training.  *Id.*  The municipality's deliberate indifference must also have caused the constitutional

injury at issue in a particular case.  *City of Canton*, 489 U.S. at 391.  As the Supreme Court

phrased the key question:  "Would the injury have been avoided had the employee been trained

under a program that was not deficient in the identified respect?"  *Id.*

      Assuming that the officers' conduct amounted to a constitutional violation, I nonetheless

find that Plaintiff has failed to advance evidence supporting municipal liability.  The central

weakness in Plaintiff's case is that Philadelphia admittedly *did* provide training to its officers not

to do what Plaintiff alleges was unconstitutional, as evidenced by Use of Force Directive 22-5.

The very policy invoked by Plaintiff to argue the individual liability of the officers undercuts its

case asserting direct liability under *Monell.*

      There could be circumstances where an existing policy was so routinely violated or so

obviously ineffective that a municipality could be deliberately indifferent to the need for

additional training.  Plaintiff here, however, has not produced evidence of a pattern of similar

violations or the need for additional training.  Plaintiff concedes, "there has been no evidence to

show a pattern of Tasering impaired suspects jumping on the roofs of cars."  Plaintiff's

Memorandum in Opposition at 8.  Plaintiff also recognizes that Philadelphia police officers are

trained to use Tasers, that the official policy directs officers not to use Tasers when a person is in

an elevated position, and that Philadelphia trains its officers about how to handle themselves

"when confronted with mentally impaired suspects."  *Id.* at 7.  Plaintiff argues that the City's

training was lacking here because it failed to address a circumstance where the suspect was both

drug-impaired *and* in an elevated position.  As Officer Panarello testified, the threat matrix

would have been the same, and his decision.  Dep. Panarello 66:10–12.  I find that Plaintiff has

not produced evidence that the need for training beyond the training already provided.

Therefore, I will grant summary judgment against Plaintiff for his claims against the City of Philadelphia.

      c. State Law Claims Against Individual Officers

      The final count of Plaintiff's Complaint alleges a state law claim of assault and battery against the individual police officers.  Complaint ¶¶ 39–42.  Defendants seek summary judgment on the ground that the officers are immune under the Pennsylvania Political Subdivision Tort Claims Act.

      The Subdivsion Act provides broad immunity for actions taken within the scope of employment, and liability will attach only if a claim fits within an enumerated exception.  42 Pa. C.S.A. § 8545, *see Renk v. City of Philadelphia*, 537 Pa. 68, 72, 641 A.2d 289, 292 (1994).  Only one exception has potential applicability here:  where the evidence shows that "the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice, or willful misconduct."  42 Pa. C.S.A. § 8550.   Pennsylvania's Supreme Court has defined willful misconduct as "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." *Renk*, 537 Pa. at 75, 641 A.2d at 293 (citing *King v. Breach*, 540 A.2d 976, 981 (Pa. Cmwlth. Ct. 1988)).

      Plaintiff emphasizes that Officer Panarello was aware of the police department policy instructing officers not to use Tasers to subdue a person in an elevated position, arguing he would have known "using his Taser would cause a fall and substantial injury or death.  [Y]et he willfully disregarded *Directive 22* despite having no objective reason to justify the risk of Tasering" Plaintiff.  Plaintiff's Opposition to Defendants' Motion for Summary Judgment at 18. Plaintiff also asserts, without citing to the record, that Officer Panarello has been subject to

multiple Internal Affairs investigations, but does not explain what bearing these apparently unrelated investigations have on Officer Panarello's conduct here.

Necessarily, my conclusion that the use of force was objectively reasonable is also dispositive of the issue of willful misconduct.  The same facts and the same considerations apply with equal force.  The officer did not engage in willful misconduct—he performed his duty as he understood it to be.

**V.**      **Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted. An appropriate order follows.

_____/s/ Gerald Austin McHugh_____
United States District Court Judge